POTTER, Appellant, vs. CITY OF KENOSHA, Respondent.

*November 11, 1954—January 11, 1955.*

364

For the appellant there was a brief by *Donald F. Boyle* of Kenosha, and *Dougherty, Ryan, Moss & Wickhem* of Janesville, and oral argument by *Mr. John C. Wickhem* and *Mr. Boyle*.

For the respondent there was a brief by *Robert V. Baker* and *Leo E. Vaudreuil,* both of Kenosha, and oral argument by *Mr. Vaudreuil*.

STEINLE, J.    The principal question confronting us upon this appeal is whether a legal duty devolved upon the city not to permit the performance of work in the trench by the contractor's employees unless shoring as required in the safety order of the industrial commission had been provided.

The trench in which William B. Potter came to his death was not protected by bracing, shoring, or sloping of walls as required by Order 610 of the industrial commission's General Orders on Tunnel, Caisson, and Trench Construction. Appellant contends that under provisions of secs. 101.01 to 101.09, inclusive, of the 1951 statutes, the situs of Mr. Potter's death was a place of employment owned by the city; that there existed at the time a legal duty upon the city to have constructed and maintained the place so as to render the same safe; that in the plans and specifications, proper provision conformable with the industrial commission general order ought to have been made by the city for making the place safe while work was being performed; and that the city's failure in these respects made it liable for the damages arising from the death of the contractor's employee.

The respondent city maintains that the place was safe when intrusted to the control of the contractor for the performance of the contract, and that the contractor alone became legally

responsible to his employee for the unsafe condition which was created while the work was in progress. It is also the position of respondent that the plans and specifications pertained only to the nature, quantity, and quality of construction desired by it as owner, and in nowise referred to the means by which the work was to be done.

The learned trial court determined that the evidence submitted by the plaintiff did not establish a cause of action against the city. The court concluded that the place was safe at the time the contractor commenced the construction work, and that the city retained no control over the place except that it reserved the right to suspend the progress of the job for inspection of the standard of material and work furnished, but not for the purpose of directing the means whereby the work was to be done, or to provide or enforce safety measures for the protection of the contractor's employees while the work was being performed.

Applicable statutory provisions necessary to a consideration of the issues are:

"101.01 (1) The phrase 'place of employment' shall mean and include every place, whether indoors or out or underground and the premises appurtenant thereto where either temporarily or permanently any industry, trade, or business is carried on, or where any process or operation, directly or indirectly related to any industry, trade, or business, is carried on, and where any person is, directly or indirectly, employed by another for direct or indirect gain or profit, but shall not include. . . .

"101.01 (3) The term 'employer' shall mean and include every person, firm, corporation, state, county, town, city, village, school district, sewer district, drainage district, and other public or quasi-public corporations as well as any agent, manager, representative, or other person having control or custody of any employment, place of employment, or of any employee.

"101.01 (13) The term 'owner' shall mean and include every person, firm, corporation, state, county, town, city,

village, school district, sewer district, drainage district, and other public or quasi-public corporations as well as any manager, representative, officer, or other person having ownership, control, or custody of any place of employment or public building, or of the construction, repair, or maintenance of any place of employment or public building, or who prepares plans for the construction of any place of employment or public building. . . .

"101.06. EMPLOYER'S DUTY TO FURNISH SAFE EMPLOYMENT AND PLACE. Every employer shall furnish employment which shall be safe for the employees therein and shall furnish a place of employment which shall be safe for employees therein and for frequenters thereof and shall furnish and use safety devices and safeguards, and shall adopt and use methods and processes reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees and frequenters. Every employer and every owner of a place of employment or a public building now or hereafter constructed shall so construct, repair, or maintain such place of employment or public building, and every architect shall so prepare the plans for construction of such place of employment or public building, as to render the same safe.

"101.07 (1) No employer shall require, permit, or suffer any employee to go or be in any employment or place of employment which is not safe, and no such employers shall fail to furnish, provide, and use safety devices and safeguards, or fail to adopt and use methods and processes reasonably adequate to render such employment and place of employment safe, and no such employer shall fail or neglect to do every other thing reasonably necessary to protect the life, health, safety, or welfare of such employees and frequenters; and no employer or owner, or other person shall hereafter construct or occupy or maintain any place of employment, or public building, that is not safe, nor prepare plans which shall fail to provide for making the same safe."

The trial court took judicial notice of Order 610 of the industrial commission's General Orders on Tunnel, Caisson,

and Trench Construction, which in so far as applicable, provides:

"Order 610. *Timber Requirements for Trenches.*
"(a) All trenches over three feet in depth shall be kept adequately and securely timbered to prevent injury to any person from falling or caving ground.
"Timbers shall be installed according to the tables of trench timbering requirements contained in paragraph (c) of this order.
"All timbers used for supporting sides of trenches shall be of good quality, reasonably straight grained, and free from weakening knots and other defects.
"(b) Trenches of three feet to five feet in depth in which men are permitted to work shall be timbered, except as provided for in paragraph (c) of this order.
"In hard solid soil timbering shall be of not less than 2 x 6-inch stringers, etc. . . .
"Trenches three feet and over in depth need not be timbered if excavated in solid rock or whenever the sides of the trench are cut down to the angle of repose. The angle of repose shall not be considered greater than one to one half (measuring one foot of rise to each one-half foot horizontal) for dry or moist soils and not more than one to one for wet or heavy soils. . . .
"Any other method of supporting the walls of an excavation will be approved if designed and constructed to afford equivalent protection."

Appellant charges that under the statute, the city is liable not only as the owner of a place of employment but also as an employer. A careful examination of the record convinces us that Tirabassi in the performance of the work under the contract was an independent contractor and not an employee of the city, and that his status was not changed by virtue of the reservation in the contract permitting the city the right of inspection. In 18 McQuillin, Mun. Corp. (3d ed.), p. 343, sec. 53.75, it is declared that:

"An independent contractor is one who is employed to do a piece of work without restriction as to the means to be employed, and who employs his own labor and undertakes to do the work in accordance with his own ideas or under plans furnished by the person for whom the work is done, to produce certain results required by such person. The mere reservation by the city of the privilege of inspecting and generally supervising the work, and making changes in the plans, does not destroy or impair the character of independent contractor. Whether one is an employee or an independent' contractor generally should be determined from the facts of the particular case, and from a proper construction of the contract as a whole."

*Strohmaier v. Wisconsin Gas & Electric Co.* (1934), 214 Wis. 564, 253 N. W. 798, held that (headnote 6):

"A contractor laying a water main for a village, who retained direct control of the progress and management of the work, and who, although the village might under certain circumstances direct the method of making joints and the lowering of pipes, retained control of the workmen and of the operations employed in such case, was an independent contractor as respects the application of the doctrine of *respondeat superior.*"

In *Smith v. Milwaukee Builders' & Traders' Exchange* (1895), 91 Wis. 360, 365, 64 N. W. 1041, this court said:

"The claim made by the defendant the Builders' Exchange, the owner of the building, that Neff and the Bayleys were independent contractors, seems to us well founded. It is true that in their contracts it is provided that the work is to be performed under the direction and to the satisfaction of the architects, acting as agents of the owner, but it is entirely certain from the whole contract that this is simply a reservation of the right of inspection. It is not a reservation of power to control the manner of the work, to change materials to be used, or prescribe ways and methods in which the work is to be carried out. The contractors have agreed to build the building according to fixed plans and specifications, and of certain materials. They can do the work in their own

manner and with their own machinery, providing they comply with their contract. The architect can only require that the building be such as the contract demands. He has no control for any other purpose. We do not regard this reservation of the right of inspection of the work as changing the character of the contract. *Hughbanks v. Boston Inv. Co.* (Iowa), 60 N. W. Rep. 640."

Legal liability under sub. (13), sec. 101.01, Stats., is not predicated alone on absolute ownership of a place of employment. Where a right to present possession, control, or dominion of such place exists, the holder of such right may be held liable, *Freimann v. Cumming* (1924), 185 Wis. 88, 200 N. W. 662. The defense of governmental function is not available under the safe-place statute, *Heiden v. Milwaukee* (1937), 226 Wis. 92, 275 N. W. 922. A place of employment includes one that is underground and where a trade or business is being carried on even temporarily and where any person employed by another for wages is working, sec. 101.01 (1), *supra.*

It appears that the crucial item for consideration in the determination of this cause is whether the city of Kenosha may be excused from liability by reason of the change in the premises brought about by the independent contractor. In *Neitzke v. Kraft-Phenix Dairies, Inc.* (1934), 214 Wis. 441, 447, 253 N. W. 579, a safe-place-statute case, Mr. Justice FAIRCHILD, speaking for the court, said:

"Situations may arise where the premises are so changed by the independent contractor as to excuse the owner from liability. If, for instance, the dangerous instrumentality is erected by the independent contractor himself, or a defective scaffolding is installed, the owner may not be liable for the injuries resulting."

Although such statement appears to be dictum, it correctly declares the principle of law with reference to the type of

situation described. However, it appears that no case has heretofore reached this court which is squarely in point with that principle.

We are constrained to hold that when an owner turns over to an independent contractor the complete control and custody of a safe place, whereon or whereunder the contractor creates a place of employment for the purpose of fulfilling the terms of the contract, the owner reserving no right of supervision or control of the work excepting that of inspection or to change the plan with reference to the construction to be furnished, if thereafter in the performance of the work under the contract the premises are changed by the contractor and as a result a hazardous condition is created, the owner does not become liable to the contractor's employee injured as a consequence of such hazardous condition while acting in the scope of his employment. Were we to hold otherwise we would be placing an interpretation upon the statute not intended by the legislature. Here, the city's purpose in letting the contract was to obtain a satisfactory sewer. By its contract the city merely designated the place where the sewer was to be located and fixed the standard of quality and quantity of construction that it desired. Everything in connection with the actual work entailed in providing such a sewer was left to, and undertaken by, the contractor. It is obvious that a sewer could not be furnished without the excavation of a trench. However, the city had not contracted for a trench; it contracted for a sewer. We perceive of no distinction of plan had the city contracted for an improvement or repair to the ceiling or wall of one of its buildings, where, in order to gain access to the place to be improved or repaired, a scaffolding would be required. As was declared in *Neitzke v. Kraft-Phenix Dairies, Inc., supra,* the furnishing of a scaffolding by the contractor would create a change in the premises turned over by the owner for which condition,

should injury result, the owner will be excused. In these compared situations failure to provide adequate shoring in the excavation of a trench as directed by the industrial commission is in the same category as failure to provide adequate scaffolding as so directed. In every such instance where the contractor is in full supervision and control of the work, he alone becomes liable to his employees under the statute for injuries sustained.

In contending that the statute imposed a duty upon both the contractor and the city in the present matter, appellant relies upon *Waskow v. Robert L. Reisinger & Co.* (1923), 180 Wis. 537, 193 N. W. 357. There, Trapp Brothers Dairy Company owned premises upon which a building was being constructed. Waskow was a plumbing contractor who was working in the building during the course of construction. Consolidated Sheet Metal Works had the contract for sheet-metal construction. A door had been installed by the sheet-metal company. Waskow was injured when the handle of the door came off as he attempted to open the door and he fell into an unguarded opening. The owner was held liable for not having maintained a safe place of employment. However, it was established that the owner had retained general control of the building. There was no general contractor to whom the control and custody of the building had been surrendered. The owner itself had let separate contracts to different firms for the various types of work in the construction of the building. When Waskow came on the job he was furnished a place of employment by the owner which was unsafe by reason of the conduct of another contractor. It was also held that when an owner employs several distinct contractors in the construction of a building, the owner is deemed to have retained such control and custody of the premises as to make him responsible for them. In that case the court said (p. 544):

"The work of construction was let piecemeal to various contractors, *none of whom had the complete control and custody of the building.* [Emphasis supplied.] The defendant Dairy Company and its architect were the only ones having such custody and control. On this state of facts we think that the statutes referred to [safe-place statute] apply. . . ."

In the present matter, had Tirabassi been engaged only to excavate the trench, and had some other contractor been engaged to lay the tile, then assuming that the tile-laying contractor or his employee had been injured or killed as the result of the failure to shore, it is apparent that an unsafe place would have been provided to him by the city, and clearly the city would be held liable. In the present case a safe place had been provided by the city. The employer of the deceased made it unsafe when he changed it.

In *Umnus v. Wisconsin Public Service Corp.* (1952), 260 Wis. 433, 51 N. W. (2d) 42, the owner likewise had engaged different contractors for construction work upon its building. Recovery was permitted against the owner for the reason as appears that the owner had retained complete control and custody of the building. In the instant case the city did not retain control.

*Criswell v. Seaman Body Corp.* (1940), 233 Wis. 606, 290 N. W. 177, is also distinguishable from the case at bar. There the owner was held liable to an employee of a subcontractor. However, there the owner had provided an unsafe place of employment. Uninsulated high-tension wires existed upon the premises of the owner while the employee was working there. The injury occurred when a metal cable over the boom of a derrick used in erecting an iron column came into contact with the live wires. Had the wires been removed or at least, had the power been shut off, the injury would not have occurred. In the present matter a safe, empty street had been furnished to the contractor by the city. The contractor was given complete custody and control of it.

No hazard existed when it was turned over to the contractor. The contractor alone created the hazard when he changed the premises and failed to shore the trench in conformity with the industrial commission order.

In *Kuske v. Miller Brothers Co.* (1938), 227 Wis. 300, 277 N. W. 619, the Brillion Pulverizer Company had on its premises a quantity of scrap iron which it desired to have broken into smaller pieces. Miller Brothers Company as an accommodation sent its employee Kuske and another with an apparatus for breaking the scrap on the Pulverizer Company's premises. An employee of the Pulverizer Company assisted Kuske. In the breaking-up operation Kuske was injured during the process. Miller Brothers Company was not an independent contractor. The Pulverizer Company knew of the danger of the operation. It was held that the premises furnished by the Pulverizer Company was a place of employment which it was obliged to have kept reasonably safe. It does not appear that the owner surrendered control of the premises.

In *Connor v. Meuer* (1939), 232 Wis. 656, 288 N. W. 272, the city of Madison had permitted bleachers to be erected upon its premises. Plaintiffs were injured when the bleachers collapsed. There was no showing that the city owned or constructed or maintained the bleachers or that any of its officers had the *control or custody thereof*. The court said (p. 663):

"To hold under the facts alleged in the complaint that the city of Madison is liable under the safe-place statute for the injuries and damages sustained by the plaintiffs would be to stretch the meaning of the words of the safe-place statute to lengths clearly, in our opinion, not contemplated by the legislature, and to apply the statute to a situation to which the legislature never intended that it should be applied."

In the case at bar, the city had no control over the manner in which the work was being done. The shoring was the

obligation of the contractor, not that of the city. The contractor had agreed to provide necessary shoring and had bound himself to comply with all laws, regulations, and ordinances which, obviously, included observance of industrial commission's General Order 610 on trenches.

It is clear that the purpose of the city's reservation in the contract of the right to suspend work pertained only to its privilege to inspect the progress of the work and to determine whether it desired change of that which was to be furnished under the contract. The arrangement did not impair the owner-independent-contractor relationship existing between the parties. Korzilius, the city inspector, was not authorized to direct the means employed by the contractor in furnishing the sewer. His function was to examine the work and material as the job progressed in order to make certain that the city would obtain the kind of sewer structure which it had ordered. The contractor would not have been bound, by any suggestion or direction made by Korzilius or any other of the city employees, to erect shoring as required by the commission's order.

It does not appear that the provisions in the specifications as to shoring left discretionary with the contractor what Order 610 made mandatory, in view of the fact that the specifications directed a compliance with all laws, regulations, and ordinances. The "public need" referred to in the specifications pertained to the pleasure of the city in providing a sewer for the public at the place in question. It goes to the matter of public requirement, or public desire or ability to acquire, and does not appertain to safety precautions while the work is in progress.

Since the premises were initially safe when turned over to the contractor by the city, and since the change of the premises which produced the damage resulted entirely from the action of the contractor, the city having retained no control over the same, we are obliged to determine that the city

was not liable for the damages which so accrued. The judgment of the trial court is sustained.

*By the Court.*—Judgment affirmed.